# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAMON TORRES LORENZANA,** | : | **Civil No.  1:21-CV-2149** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Ramon Torres Lorenzana applied for disability benefits and supplemental security income under Titles II and XVI of the Social Security Act on December 16, 2019, alleging an onset date of disability of October 31, 2013. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Lorenzana was not disabled during the relevant period and denied his application for benefits. Lorenzana now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   **Statement of Facts and of the Case**

Lorenzana filed his claim for disability benefits and supplemental security income on December 16, 2019, alleging an onset date of disability of October 31, 2013. (Tr. 21). Lorenzana alleged disability due to the following impairments: left arm injury, high blood pressure, gout, a hernia, and depression. (Tr. 65). He was 46

years old at the time of his alleged onset of disability, had at least a high school education, and had past relevant work experience as an arc welder. (Tr. 29, 65).

Regarding his physical impairments, the record, is incomplete, and fragmentary, and dates only as far back as December of 2019. This recoord revealed the following: In December of 2019, Lorenzana presented to UPMC ten days after arriving from Puerto Rico, complaining of a cough and medication needs. (Tr. 344). At this visit, Lorenzana reported no leg pain or swelling. (Id.) A musculoskeletal examination revealed no back, neck, or calf pain. (Tr. 346). At a December 23, 2019 visit to UPMC, a physical examination revealed no gait disturbance, no joint inflammation, and no deforming arthritis. (Tr. 352). At this visit he was diagnosed with strep throat, and his blood pressure medications were refilled. (Tr. 353).

On January 6, 2020, Lorenzana was seen by Dr. Benjamin Stewart, D.O., at the Family Practice Center, where it was noted that he had gout but reported no recent flares and that he was watching his diet. (Tr. 447). A month later on February 6, Lorenzana presented with pain and swelling in his right knee, and it was noted that he had been eating red meat and pork which seemed to make it worse. (Tr. 450). On examination, Lorenzana walked with a normal gait, and it was noted that there was some soft tissue swelling in his left knee and his bilateral knees were tender to palpation over the patella. (Id.) He was started on medication for his gout. (Tr. 451).

3

In March of 2020, Lorenzana underwent an internal medicine examination with Daniel Chege, N.P. (Tr. 320-34). Mr. Chege noted Lorenzana's chief complaint as his left arm injury which he suffered in 2013. (Tr. 320). He also noted that Lorenzana had been diagnosed with gout in his bilateral knees and ankles, and that he was taking medication for this. (Id.) As for his activities of daily living, Lorenzana lived alone and needed no help at home, could drive a vehicle, cooked seven days per week, and cleaned, shopped, and did laundry once per week. (Tr. 321) Mr. Chege noted that Lorenzana had a normal gait, was able to walk on heels and toes without difficulty and squat fully, had a normal stance and did not need an assistive device, was able to get on and off the examination table without assistance, and was able to rise from a chair without difficulty. (Tr. 322). Lorenzana's straight leg raise testing was negative bilaterally, and his joints were stable and nontender. (Tr. 323). Mr. Chege noted evidence of joint deformity relating to Lorenzana's amputated thumb. (Id.) However, Lorenzana was able to zip, button, and tie without difficulty. (Id.)

Thus, Mr. Chege opined that Lorenzana could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; he was able to sit 5 hours at a time and stand and walk for 4 hours without interruption; he could frequently reach, handle, finger, and feel, but could only occasionally push and pull; he could frequently

balance and stoop and could occasionally climb ramps, stairs, ladders, and scaffolds, kneel, crouch, and crawl. (Tr. 325-28).

At a visit to UPMC in April of 2020, Lorenzana reported back pain, but on examination, he exhibited normal range of motion. (Tr. 356-57). In May of 2020, it was noted that Lorenzana had back pain, but that he had no difficulty walking, no gait problem, and no leg or muscle pain or weakness. (Tr. 384). At this time, it was also noted that Lorenzana had undergone a partial amputation of his thumb in 2013 after an injury to his hand and forearm. (Tr. 382). Indeed, in May of 2020, Lorenzana complained of a small open wound on the tip of his left thumb. (Tr. 369). It was noted that he had a recurrent blister which appeared to be due to repeat burn injuries that he was not noticing when he was cooking due to his neuropathy. (Tr. 386). It was further noted that Lorenzana had an X-ray which showed no signs of underlying osteomyelitis. (Id.) Lorenzana agreed to a wound care plan, which he followed, but he ultimately was referred to Penn State Hershey Medical Center for a consultation regarding further amputation of his left thumb. (Tr. 388-417). Lorenzana was seen at Hershey Medical on June 9, 2020 to discuss his options with respect to his left thumb. (Tr. 426). Treatment notes indicate that Lorenzana agreed to further amputation of his left thumb. (Tr. 427). Lorenzana underwent a revision of his left thumb amputation on July 13, 2020. (Tr. 432).

Lorenzana was also seen at the Family Practice Center in July of 2020 complaining of continued low back and knee pain. (Tr. 465). On examination, he walked with a normal gait, exhibited good range of motion in the spine and knees, and had 5/5 strength in his bilateral lower extremities with sensation intact to light touch. (Id.) Lorenzana was diagnosed with bilateral primary osteoarthritis of the knee. (Tr. 466). An X-ray of his right knee from July of 2020 indicated that Lorenzana had mild to moderate knee joint effusion without fracture, and early degenerative change most pronounced of the medial femoral and patellofemoral compartments. (Tr. 558). An X-ray of his left knee showed mild tricompartmental degenerative change without acute bony abnormality. (Tr. 559).

In March of 2021, Lorenzana had another X-ray of his knee, which showed large suprapatellar joint effusion of uncertain etiology and no acute bony abnormality. (Tr. 562). The findings further indicated that this was out of proportion to the degree of mild degenerative process in the right knee. (Id.) Lorenzana was seen at the Family Practice Center on March 15, 2021, at which time it was noted that he had been seen in the emergency room on March 12 for left knee effusion. (Tr. 570). He was given an immobilizer in the ER, but he complained that he was having trouble sleeping due to the pain. (Id.) On examination, Lorenzana walked with a limp, his left leg was in an immobilizer, and it was noted that his left knee

was painful to touch. (Tr. 571). He was given a temporary prescription for Percocet and was referred to the walk-in clinic. (Id.) On March 23, 2021, Lorenzana had his left knee drained. (Tr. 568). It was noted that he had a gout flare up, but on examination, he walked with a normal gait, although his left knee was red, warm, and tender. (Tr. 568-69).

It is against this medical backdrop that the ALJ held a telephonic hearing on Lorenzana's claim on April 6, 2021. (Tr. 37-64). At the hearing, both Lorenzana and a Vocational Expert testified. (Id.) By a decision dated April 21, 2021, the ALJ denied Lorenzana's application for benefits. (Tr. 21-31).

In that decision, the ALJ first concluded that Lorenzana met the insured status requirements under the Act on December 31, 2013 and had not engaged in any substantial gainful activity since his alleged onset date of October 31, 2013. (Tr. 23). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Lorenzana's amputation of his left thumb and gout were severe impairments. (Tr. 24). The ALJ found Lorenzana's depression and anxiety to be nonsevere impairments, concluding that he had only mild limitations in the areas of functioning. (Tr. 24-25). The ALJ also concluded that Lorenzana's obesity was nonsevere but noted that he was considering all of the claimant's impairments in assessing the residual functional capacity. (Tr. 24). At Step 3, the ALJ determined

that Lorenzana did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 25-26).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Lorenzana's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and he can occasionally perform postural activities. He can occasionally handle and never button with his dominant left upper extremity.

(Tr. 26).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Lorenzana's testimony regarding his impairments. On this score, the ALJ considered the opinions of Dr. Robysina James, M.D. and Dr. Joanna Deleo, D.O., two state agency consulting sources. (Tr. 28). Dr. James opined in April of 2020 that Lorenzana could perform light work, in that he could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; could sit, stand, and walk for 6 hours in an 8-hour workday; and could frequently climb ramps and stairs, balance, stoop, crouch, and crawl and could occasionally climb ladders, ropes, and scaffolds. (Tr. 76-78). Dr. James specifically noted that her RFC took into account the plaintiff's pain, including his history of gout, knee pain, and amputation. (Tr. 78). On reconsideration, Dr. Deleo opined in November of

2020 that Lorenzana could perform light work with the same postural limitations as set forth by Dr. James. (Tr. 92-94). Dr. Deleo noted that the evidence did not show any changes in Lorenzana's conditions and no worsening of his impairments in that time period. (Tr. 93).

The ALJ found these opinions persuasive, as they were supported by the longitudinal treatment notes which generally showed a normal gait, normal range of motion, full strength, intact sensation, and no edema. (Tr. 28). The ALJ noted that these statements were also consistent with Lorenzana's activities of daily living, which included attending family gatherings, preparing meals, doing laundry, cleaning, and that he had no difficulties with his personal care activities. (Id.) The ALJ also considered Mr. Chege's opinion and found this opinion partially persuasive. (Id.) The ALJ reasoned that Mr. Chege's opinion was mostly consistent with the claimant's treatment records, but that the Lorenzana was not as limited in standing, walking, and sitting as Mr. Chege had opined. (Id.) Rather, the ALJ found that Mr. Chege's limitations on this score were not supported by the treatment notes which showed a normal gait, normal stance, full muscle strength, intact hand and finger dexterity, full estimated grip strength, and could button, zip, and tie. (Id.)

The ALJ also considered Lorenzana's testimony but ultimately found that Lorenzana's complaints were not entirely consistent with the medical evidence of record. (Tr. 26-27). Lorenzana testified that his gout affected his knees and ankles, and that his knees were very swollen and he used a cane. (Tr. 46). He also stated that he was prescribed a brace for his knee. (Tr. 47). He testified that he tries to walk for 15 minutes outside, but that he would have to go back inside because of his leg pain. (Tr. 51). He stated that he was unable to tie his shoes because he could not bend his knee. (Tr. 53). He further noted that eating red meat made his gout worse. (Tr. 54-55). He testified that he took medication and used a stabilizer for the pain. (Tr. 55). Lorenzana also testified regarding his left thumb amputation, in that he was left-hand dominant but was learning how to write with his right hand; he was able to zipper but could not button; and he was able to use utensils to eat. (Tr. 49). He also stated that he was able to carry a gallon of milk with his left hand and serve a glass of milk, but he could not carry a coffee cup. (Tr. 53-54).

Ultimately, the ALJ found that Lorenzana's testimony was not consistent with the record evidence. (Tr. 26-27). The ALJ noted that the treatment notes showed normal gait, normal range of motion, full strength, intact sensation, no swelling, and no edema. (Tr. 27). The ALJ noted Mr. Chege's March 2020 evaluation, during which Lorenzana was able to do a full squat, had a normal gait and stance, and was

10

able to rise from a chair without difficulty. (Id.) The ALJ further stated that Lorenzana's allegations regarding his amputation were not consistent with the record, which showed that he cooked seven days per week and did weekly household chores. (Id.) The ALJ pointed to evidence in the record regarding Lorenzana's negative straight leg raise testing and full strength in his lower extremities, reasoning that the record did not support Lorenzana's alleged limitations. He further noted that while Lorenzana testified he had trouble with his hands, he also testified that he could zipper and use utensils. (Id.)

The ALJ further stated that he considered a February 2020 statement from the claimant's then-wife, Maryra Collazo Melendez, and found this statement to be largely consistent with the claimant's allegations regarding his impairments. (Tr. 26).

Having arrived at this RFC assessment, the ALJ found at Step 4 that Lorenzana could not perform his past relevant work. (Tr. 29). The ALJ then made a finding at Step 5 that Lorenzana could perform work available in the national economy as a conveyor line bakery worker, a fruit distributor, and a laminating machine off bearer. (Tr. 30). Accordingly, the ALJ concluded that Lorenzana did not meet the stringent standard for disability set by the Act and denied his claim. (Tr. 31).

This appeal followed. (Doc. 1). On appeal, Lorenzana contends that the ALJ failed to properly consider his knee pain due to his gout, as well as his limitations from this left thumb amputation. Further Lorenzana argues that the ALJ did not meaningfully consider the February 2020 third party report of his wife because the report was answered in Spanish, and there is no record of the report being translated to English. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the

ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able

16

to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11

17

(3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir.

18

2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the

ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in December of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating

20

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with

respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.   Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that

governs Social Security appeals, and the requirement that courts carefully assess

whether an ALJ has met the standards of articulation required by law, is also

illustrated by those cases which consider analysis of a claimant's reported pain.

When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,* 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted).

Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms

alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### E.   **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Lorenzana was not disabled. Therefore, we will affirm this decision.

At the outset, Lorenzana contends that the ALJ failed to properly account for his limitations due to his knee pain from his gout and his thumb amputation. The plaintiff asserts that the ALJ's reliance on Mr. Chege's opinion was misplaced, as Mr. Chege saw Lorenzana for a one-time evaluation. Lorenzano also argues that the ALJ did not properly consider his obesity in formulating the RFC.

We first note again that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden,

191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Here, the ALJ examined all of the medical opinions in the record and found the opinions partially persuasive. At the outset, we note that there was no medical opinion in the record which concluded that Lorenzana was as limited as he alleged, let alone that he was disabled. On this score, the ALJ found that Dr. James' and Dr. Deleo's opinions were largely consistent with the medical evidence of record. These opinions stated that Lorenzana could perform light work with occasional postural limitations, which the ALJ explained was consistent with and supported by treatment records which showed a normal gait and stance, full muscle strength, normal range of motion, intact sensation, and no edema, and were consistent with Lorenzana's activities of daily living. The ALJ also found Mr. Chege's opinion partially persuasive, but opined that the standing, walking, and sitting limitations in this opinion, which were only slightly more limited than Dr. James' and Dr. Deleo's opinions, were not supported by the treatment records as stated above.

The ALJ also considered Lorenzana's testimony but concluded that his subjective complaints were not entirely consistent with the medical record. The ALJ

reasoned that while Lorenzana testified as to his inability to perform any activities due to his leg pain and thumb amputation, these allegations were not supported by treatment notes. Indeed, the record indicated that Lorenzana was able to cook daily, perform weekly household chores, and carry a gallon of milk, although he stated he could not carry a coffee cup, and objective examinations revealed that he had a normal gait, stance, and range of motion, no edema or swelling, and negative straight leg raise testing. The ALJ also found that Lorenzana's own reported activities of daily living undercut his subjective complaints, as he stated he could cook, clean, do laundry, shop, socialize, and drive a vehicle.

On this score, the ALJ was confronted by several medical opinions, all of which found that the plaintiff could perform a range of light work with some postural limitations. The ALJ also limited Lorenzana to only occasional handling and never buttoning with his left upper extremity due to his amputation. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why these opinions were partially or largely persuasive and why he found parts of other opinions, including Mr. Chege's, inconsistent with the medical evidence. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. The ALJ also considered Lorenzana's

subjective complaints but found that they were inconsistent with the record as a whole. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the persuasiveness given to the various medical opinions in this case to determine the range of work Lorenzana could perform.

As to Lorenzana's argument regarding the ALJ's treatment of his obesity, in the instant case the ALJ found Lorenzana's obesity to be a nonsevere impairment. On this score, it is well settled that

> [A]n [ALJ's] failure to mention a claimant's obesity does not warrant a remand for further proceedings where the claimant has not expressly relied on his or her obesity as a basis for establishing functional limitations during the course of the administrative proceedings, and where he or she offers only a very generalized assertion that his or her obesity makes basic activities such as standing and walking more difficult than they would otherwise be.

Rickabaugh v. Astrue, 2010 WL 1142041, at *5 (W.D. Pa. Mar. 24, 2010) (citing Rutherford, 399 F.3d at 552-53). Indeed, Lorenzana did not rely on his obesity throughout the administrative process in this case.

Further, although he found the plaintiff's obesity to be nonsevere, the ALJ further noted that he considered all of the plaintiff's impairments, both severe and nonsevere, in formulating Lorenzana's RFC. While Lorenzana now argues that his obesity impacted his ability to function, as one court in this circuit has noted, "[m]ere

speculation that obesity combined with other impairments necessitates more significant RFC limitations is insufficient to overturn the ALJ's analysis." Del Grippo v. Comm'r of Soc. Sec., 2022 WL 2713908, at *5 (D.N.J. July 13, 2022). Accordingly, we cannot conclude that the ALJ's failure to discuss the plaintiff's obesity in greater detail requires a remand here.

Lorenzana further argues that the ALJ could not have meaningfully considered the third party function report filled out by his wife in February of 2020. He contends that this report was answered in Spanish, and given that there is no record of it being translated to English, the ALJ could not have fully considered her statements. In his decision, the ALJ found that this report was largely consistent with Lorenzana's own allegations, which he ultimately found were not entirely consistent with the medical records. However, Lorenzana correctly notes that there is no document in the record of this statement being translated to English. On this score, the Third Circuit Court of Appeals has discussed the issue of translating documents in a Social Security decision. See Moraes v. Comm'r of Soc. Sec., 645 F. App'x 182, 186 (3d Cir. 2016). In that case, where the issue involved the claimant's medical records, the Court discussed the Administration's Hearings, Appeals and Litigation Law Manuel (HALLEX), which "provides that the record in a civil action for review of a final Social Security decision 'must include an English translation of any

document that contains a language other than English.'" Id. (quoting HALLEX, §
I—4-1—54). However, the Third Circuit found that "as an internal manual,
HALLEX does not have the force of law." Id. (citing Schweiker v. Hansen, 450 U.S.
785, 789 (1981)) (finding that the Administration's Claims Manuel does not have
the force of law).

We find this circuit caselaw instructive here. In the instant case, the statement
at issue is a third-party function report of the claimant's wife in February of 2020,
in which the answers are written in Spanish, and there is no document in the record
that translates her answers to English. However, as we have noted, the HALLEX
requirement that the administrative record contain such a translated document does
not have the force of law. Moreover, while the failure to include a translation in the
record is inconsistent with the non-binding HALLEX guidance, the ALJ has
indicated that this report was considered and we are not presented with evidence that
this document was not understood or considered by the ALJ.

In any event, we find that the ALJ arguably gave Lorenzana the benefit of
every doubt when he found that Ms. Melendez's statement supported Lorenzana's
allegations regarding his impairments, although it appears that she did not live with
him at the time, as the claimant's treatment records indicated that he lived alone or,
at times, at a mission with others.  Accordingly, we cannot conclude that the ALJ

did not fully consider this third-party statement simply because the record does not

contain a translated document.

Moreover, we find that any error in the ALJ's omission of such a translated

document would be harmless. Social Security appeals are subject to harmless error

analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" <u>Moua v. Colvin</u>, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, <u>Seaman v. Soc. Sec. Admin.</u>, 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." <u>Shinseki v. Sanders</u>, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

<u>Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar.

29, 2017), <u>report and recommendation adopted sub nom.</u> <u>Metzgar v. Colvin</u>, No.

3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we

apply harmless error analysis cautiously in the administrative review

setting." <u>Fischer–Ross v. Barnhart</u>, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. <u>Seaman v. Soc. Sec. Admin.</u>, 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely

34

affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

Here, the ALJ concluded that Ms. Melendez's statement was "largely consistent with the claimant's allegations." Thus, the ALJ arguably gave Lorenzana the benefit of every doubt by finding that his wife's statements supported his allegations. However, the ALJ ultimately found that the claimant's allegations were not supported by the record. Accordingly, Lorenzana has not provided us with any indication that the failure to have a translated copy of Ms. Melendez's statement would have likely changed the outcome of the decision. Accordingly, we cannot conclude that the ALJ's failure to do so requires a remand in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this

35

court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


Submitted this 6th day of February 2023.


*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge